IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Brief April 5, 2022

## STATE OF TENNESSEE v. JAMES R. CIARAMITARO

**Appeal from the Circuit Court for Fayette County**
**No. 19-CR-150   J. Weber McCraw, Judge**

_____

### No. W2021-00046-CCA-R3-CD

_____

A Fayette County jury convicted the Defendant, James R. Ciaramitaro, of one count of rape of a child and two counts of aggravated sexual battery, and the trial court sentenced him to a total effective sentence of forty-four years.  On appeal, the Defendant contends that the trial court erred when it admitted the victim's forensic interview.  The Defendant also contends that the evidence is insufficient to support his convictions and that the trial court erred when it sentenced him.  After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which CAMILLE R. MCMULLEN and TIMOTHY L. EASTER, JJ., joined.

Bo Burk, District Public Defender; Kari I. Weber, Assistant Public Defender, Somerville, Tennessee, for the appellant, James R. Ciaramitaro.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Mark E. Davidson, District Attorney General; and Falen M. Chandler, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION
### I. Background and Facts

This case arises from the Defendant sexually abusing three minor children: six-year-old K.D., two-year-old K.M., and two-year-old J.M.[1]  For these offenses, a Fayette County grand jury indicted the Defendant for one count of rape of a child for K.D., one count of aggravated sexual battery for K.M., and one count of aggravated sexual battery for J.M.

_____

[1] It is the policy of this court to refer to minor children by their initials.

## A. **Motion in Limine**

Prior to trial, the State filed a motion seeking to introduce a forensic interview conducted with K.D. pursuant to Tennessee Code Annotated section 24-7-123. The trial court held a hearing on the motion, during which the following evidence was presented: K.D. testified that she was seven years old and understood the meaning of telling the truth. She testified that she met with Sydni Turner, who interviewed her about incidents involving the Defendant. K.D. stated that she had known the Defendant for a long time. She recalled that the interview was video recorded and that she told the truth during the interview. During the interview, K.D. told Ms. Turner what also had happened to K.M. and J.M. and said that the Defendant had done "things" to K.M. and J.M. On cross-examination, K.D. stated that she spoke to Ms. Turner a "few days" after the incidents happened. She stated that her sister, Elizabeth McDonald, and J.M. and K.M.'s mom had asked her questions about what happened, but she could not remember if anyone else had. On redirect-examination, K.D. testified that no one told her what to say in her interview with Ms. Turner and that she told the truth.

Ms. Turner testified that she was employed as a forensic interviewer at the Carl Perkins Center (hereinafter "Rape Crisis Center") and that she interviewed K.D. on May 1, 2019. Ms. Turner testified that the interview was conducted based on a referral from the Department of Children's Services and a sexual assault allegation. Ms. Turner testified that she was trained in National Child Advocacy Center protocol which allowed the interview conductor to account for the age of the victim and any delays or disabilities. Ms. Turner stated that the protocol dictated open-ended questions that would elicit a narrative response. A video recording of the interview was played for the court, which we summarize later in this opinion. After viewing the recording, the trial court stated that it would grant the motion to introduce the video into evidence. The trial court found that K.D. was under the age of thirteen, that she described acts of sexual contact, that K.D. testified under oath that she was truthful in the interview, and that the video was a true account of her interview with Ms. Turner. The trial court went on to state:

> In considering the trustworthiness of the video, the Court has considered these following factors: the mental and physical age of the child [K.D.] and the maturity of the child. The child testified reasonably and she appeared to be mature for her age as far as answering questions and stating what she believed had happened. There was no motive for the child to testify falsely or distort the events from what I could ascertain. The timing of the child's statement was within a few weeks of this alleged event. Her statements were spontaneous or either directly responsive to the questions asked. The Court finds the interview was reliable and that there was the absence of any leading questions. Also, the Court finds that the equipment used to make the recording appears to be accurate and was capable of making

2

such a recording. The Court does find that the interview was conducted by a forensic interviewer who met the qualifications of the statute. The Court finds that she had graduated from an accredited college or university. She had the appropriate Bachelor's Degree in a field related to social services, and the Court finds that criteria under the statute as far as her experience has been met. Also, the Court recognizes there was a stipulation that the Court has considered. The recording is both visual and oral and is recorded on videotape or a similar audio/visual means. It appears that the interview -- the entire interview was recorded and that the recording is unaltered and accurately reflects the interview of the child. Every voice heard on the video or recording has been properly identified.

On these bases, the trial court found that the video was trustworthy and, therefore, admissible.

## B. Trial

The following evidence was presented at the Defendant's trial: Elizabeth McDonald testified that on April 12, 2019, she dropped her one-year-old son off at her brother's, Robert McDonald, house and left to prepare to go out for the evening. The Defendant was present at Robert McDonald's house. Also present were Elizabeth and Robert McDonald's six-year-old younger sister K.D., and two-year-old twins K.M. and J.M., who were family friends. Elizabeth McDonald left the house and returned a short time later. When she walked into the house, she found the Defendant lying on the couch with her sister K.D., and they were covered by a sheet. The Defendant "had his right hand under the sheet . . . clearly in her vaginal area." He "snatched" his hand away when Elizabeth McDonald walked into the room. Elizabeth McDonald removed the sheet and could see K.D. trying to pull her pants up. K.D. ran from the room and said she needed to go to the bathroom and that she was scared. K.D. told Elizabeth McDonald that the Defendant had not touched her. Elizabeth McDonald removed all the children from the house and called the police.

Elizabeth McDonald testified that the Defendant had been a family friend her entire life and had lived with her mother at times. She clarified that, at the time of the incident, Robert McDonald had primary custody of K.D. and she had joint custody; that arrangement had changed at the time of trial with Elizabeth McDonald having primary custody.

Elizabeth McDonald testified that she asked K.D. what had happened that day and that K.D. responded that the Defendant was touching her "No-No." She reiterated that she had seen the Defendant's hand on K.D.'s vagina.

On cross-examination, Elizabeth McDonald testified that the Defendant cared for K.D., K.M., and J.M. often. She recalled speaking to law enforcement on the night of this incident and accompanying K.D. to a physical exam.

3

Jammie Veen testified that she was the mother of two of the victims, twins K.M. and J.M. Ms. Veen testified that they were four years old at the time of trial and were two years old on April 12, 2019. On that day, they were home being "babysat" by the Defendant and Elisha Wilson. Ms. Veen left the children in their care and went to Walmart before she received a call to return home because "something had happened." On cross-examination, Ms. Veen clarified that the Defendant was living in her home at that time and had babysat her children previously. She stated that J.M. was autistic and non-verbal. Ms. Veen testified that, while she was still at Walmart on April 12, the Defendant called her and said, "I'm sorry. I didn't mean to do this. You can have everything." When she returned home from Walmart, the Defendant was gone. She had no contact with him after that telephone call.

Geoffrey DePriest, an officer employed by the Somerville Police Department, testified that he responded to Robert McDonald's residence on April 12, 2019 and spoke with the adults there. The victims were escorted from the residence to the Rape Crisis Center by Sergeant Farris Conley. Officer DePriest went back to the police station where he was met by Sergeant Conley, who brought the victims' rape kits from the Rape Crisis Center. The rape kits were introduced into the record as evidence, along with some personal items belonging to the victims.

Officer DePriest recalled that on May 1, 2019, a forensic interview was conducted with K.D. at the Rape Crisis Center; he watched the interview via recording. Officer DePriest followed up with Elizabeth McDonald later that day as part of his investigation, which eventually led him to issue an arrest warrant for the Defendant; the Defendant was arrested on June 7, 2019. Officer DePriest interviewed the Defendant on June 13, 2019, while the Defendant was in custody. The Defendant consented to having his DNA obtained, and Officer DePriest obtained two oral DNA swabs. Officer DePriest testified that the Defendant willingly participated in the June 13 interview. The Defendant "said he did not do it" and generally denied the accusations throughout the interview.

The June 13 interview was admitted into the record as evidence and played in open court. In the interview, the Defendant agreed that he had been laying on the sofa with K.D. under a sheet on the day Elizabeth McDonald found them, but he denied that he was touching K.D.

Sergeant Farris Conley testified that she was employed by the Somerville Police Department and responded to a call at Robert McDonald's residence on April 12, 2019, about a possible assault to a child. Upon her arrival, Sergeant Conley spoke with Elizabeth McDonald who stated that she had walked into the house and seen K.D. on the sofa with the Defendant with a sheet on top of them. Through the "thin" sheet, Elizabeth McDonald reported that she could see the Defendant's hand on K.D.'s vagina and that he jerked it away. Elizabeth McDonald saw that K.D.'s pants were down. Sergeant Conley

4

immediately escorted K.D. and the other children to Rape Crisis Center.

Sydni Turner testified that she was employed as a forensic interviewer at the Rape Crisis Center and that she interviewed K.D. on May 1, 2019. The recorded interview was played for the jury. In the interview, K.D. told Ms. Turner that J.M. had been diagnosed with autism and that he had nightmares. K.D. said that she, J.M., and K.M. shared a bedroom. K.D. stated that the Defendant was caring for her and J.M. and K.M. on the day in question. She stated that Elizabeth McDonald left the children with the Defendant while she went back to her house to change clothes. K.D. stated that the Defendant was her brother's, Robert McDonald, friend. K.D. recalled that she was playing with dolls when Elizabeth McDonald left the house. J.M. and K.M. were in the living room, and the Defendant was watching television. The Defendant put a kids' show on television in the living room, and K.D. went to watch on the couch. She got cold, "covered up," and then the Defendant got under the "blanket" with her and "started to touch [her] No-no." K.D. said that she laid down, and the Defendant kept touching her. K.D. later clarified that she covered up with a sheet and that the Defendant covered himself too. K.D. stated that the Defendant handed her his cell phone to play a game and then he started to touch her "No-no's," which she clarified meant her "To-Tee," (indicating her vagina), her "bottom," and her breast area. She stated that the Defendant touched her "No-no's" with his hand and "rubbed it." K.D. recalled that she had a skirt on and that she was sitting cross-legged. She stated that he rubbed the skin on her "To-Tee." K.D. demonstrated how the Defendant went around her underwear to put his hand on her vagina. She showed that the flat of the Defendant's palm touched her vagina and was moving his hand in a circular motion. She recalled Elizabeth McDonald came into the room and took the sheet off, and the Defendant's hand "wasn't all the way out" of K.D.'s underwear and vaginal area. K.D. said Elizabeth McDonald was mad and "hollered" loudly. K.D. described that she was wearing an orange skirt, purple underwear, and a long-sleeved shirt. K.D. stated that she was six years old at the time.

When asked, K.D. stated that the Defendant had not touched her any other times but that he had touched J.M. and K.M. that same day. She indicated that he touched K.M.'s "To-Tee" with his hand as well as J.M.'s bottom. K.D. was playing "spies" and saw the Defendant touch the other children. K.D. clarified that the Defendant was touching K.M.'s bare skin in her vaginal area. K.D. described how the Defendant touched J.M. and K.M. at the same time. She described J.M. wearing a diaper and how the Defendant put his hand inside J.M.'s diaper on his bottom. K.D. saw the diaper "go up and down."

K.D. testified that she had reviewed the recording of the May 1 interview with Ms. Turner and that everything she said during the interview was true.

Diary Prater testified that she had been employed at the Rape Crisis Center as a registered nurse and that she performed a "basic assessment" of K.D., including a physical examination. Ms. Prater testified that K.D. had no signs of physical injury or trauma. K.D.

reported to Ms. Prater that Robert McDonald's "friend" had touched her "No-No," which K.D. indicated to Ms. Prater meant her vagina. Ms. Prater also performed assessments of J.M. and K.M. They were non-communicative but Ms. Prater did not observe any abnormalities to their genitalia.

Mark Dunlap, a special agent with the Tennessee Bureau of Investigation, testified that he worked as a forensic scientist in the crime lab of the biology unit; he was admitted as an expert in that field. Agent Dunlap testified that he received evidence from Officer DePriest: the Defendant's DNA sample, saliva and vaginal samples from K.D. and K.D.'s underwear. Agent Dunlap summarized his findings from the analysis he performed on these samples. The presence of male DNA was found in K.D.'s vaginal swab, however, there was not an amount large enough to show a match to a DNA profile. The presence of two male individuals' DNA was found on K.D.'s underwear, however, again, the profile was too small to match to a DNA profile.

Solomon Currie testified that he was a convicted felon serving a sentence for federal drug convictions at the time of the Defendant's trial. He had been housed in the same correctional facility as the Defendant for a time and testified that the two men spoke during that time. The Defendant often asked Mr. Currie for food, and Mr. Currie asked him about his offenses. The Defendant initially said that his accusers were lying about what he had done. Mr. Currie told the Defendant that Mr. Currie had been convicted of sexual offenses, which caused the Defendant to "open[] up" to Mr. Currie. The Defendant told Mr. Currie that he had been accused of touching children, including a little girl who he identified as K.D., and that he had touched her several times. The Defendant stated that he would "lick her" and that they would watch porn together. The Defendant also recounted to Mr. Currie that he had touched another little girl, K.M., who the Defendant said was a twin, when he was changing her diaper. The Defendant told Mr. Currie that he often got erections around children and that he was working to control his erections.

Mr. Currie testified that he reached out to investigators about his conversations with the Defendant because he got the sense that the Defendant might be returning home to care for the children, and he felt an obligation to protect the children.

Based on this evidence, the jury convicted the Defendant of one count of rape of a child and two counts of aggravated sexual battery.

## C. Sentencing

The trial court held a sentencing hearing, at which the victim impact statements and the presentence report were admitted as evidence into the record. Jammie Veen, mother of K.M. and J.M., testified that her children were two years old and that J.M. was autistic and K.M. had a speech delay. At the time of the sentencing hearing, the victims were four years old. Ms. Veen testified that J.M. began acting out sexually, playing with his genitals

and touching other children. She testified that J.M. remained non-verbal due to his autism and had difficulty with counseling. Ms. Veen testified that K.M. also touched her own genitals and had severe anxiety and panic attacks. Ms. Veen stated that K.M. became afraid of men and had been in counseling to help with her "sky high" anxiety. Ms. Veen testified that, as a mother, she could no longer trust her children with another person, and she also could not trust her children to be around other children. She stated that her children trusted the Defendant, viewing him as an uncle, and that they would never be the same.

Elizabeth McDonald testified that she was primary custodian for her sister K.D. She explained that she had been taking care of K.D., in conjunction with her brother Robert McDonald, since their mother had died and their father had lost custody. Since the rape, K.D. had not been able to be around other children or men. K.D. had been unable to sleep and suffered persistent nightmares. Elizabeth McDonald explained that K.D. had been acting out in an inappropriate sexual manner around other children and adults, including babysitters. She recounted that one babysitter stopped working for them after K.D. tried to convince the babysitter's children to play sex games. Elizabeth McDonald stated that she could not trust K.D. to be around her children. She stated that she had trusted the Defendant to take care of the children because she had known him all her life and thought of him as a brother.

Based on this evidence, the trial court stated the following:

> By agreement the range of the sentence on the rape of a child is 25 to 40. Its range is determined by law which presents that as a Range II, and the appropriate range on the aggravated sexual battery is 8 to 12. So then the Court must consider enhancing factors which I've done and now will go through on the record.

> With regard to the State's enhance[ment] factors, the Court does not agree that the offense involved more than one victim for the purposes of enhancement. Each victim is named in counts that the Court does not believe is helpful for enhancing or is it appropriate. Next, the Court looks at the enhancement offered by the State, being the victim of the offense was particularly vulnerable because of age or physical or mental disability. I don't find that that applies with regard to the rape of a child because of the nature and definition of the charge nor do I find that applies in Count Two. However, I do find that that applies with regard to Count Three because the victim [J.M.] was autistic and had a special issue as the proof shown so noted.

> With regard to enhancing factor that the offense involved a victim and was committed to gratify the [D]efendant's desire for pleasure or excitement, that is not an enhancing factor as that is part of the definition of the crime. More specifically, this factor cannot be used to enhance the sentences in

7

cases of sexual battery or aggravated sexual battery because those crimes must be committed for the purpose of sexual gratification by terms of the statute. It's not deemed to be an essential element for the rape conviction. However, the Court does not find that that is going to be appropriate in this case so that is not an enhance[ment] factor.

Next is the [D]efendant abused a position of public or private trust that significantly facilitated the commission or fulfillment of the offense. There was testimony that the [D]efendant lived off and on with the sister as a member of the household. There was testimony that there was a trust relationship amongst these parties. The Court does find that that can be an enhance[ment] factor. You have an adult perpetrator who is a member of the same household and occupied a position of a trust with respect to the minor, that this person was used off and on as a babysitter and that the parties relied upon him so there is some position of trust, so that is an appropriate for enhance[ment] factor.

With regard to mitigating factors, the Court does accept both of those as submitted by the defense, that the conduct did not cause or threaten serious bodily injury as defined by the law, and he does have no prior criminal history.

Next I must consider whether or not there should be consecutive or concurrent sentencing. The State relies upon the fact that the [D]efendant is convicted of two or more statutory offenses which involve sexual abuse of a minor and also argues that the Court should consider aggravating circumstances which have arisen or arose with the relationship between the [D]efendant and the victim or victims. The Court also looks at the nature and scope of the sexual acts, the extent of any residual physical and mental damage to the victim or victims. Again, the Court considers the testimony of the witnesses today in court, also considers the victim impact responses as filed and as made part of this sentencing hearing. So the Court does believe that consecutive sentencing is permitted based upon those factors.

From all of which sentence is going to be as follows. . . . . When determining the specific sentence to be imposed within a range of punishment, the Court should consider but is not bound by considering all the advisory sentencing guidelines. The minimum sentence within the range is a sentence which should be imposed and the sentence length within that range should be adjusted appropriately by the presence or absence of mitigating and enhance[ment] factors. As I said, I have considered all of those factors. The law provides that the sentencing judge, however, shall consider but is not bound by the sentencing guidelines, thus consideration of

8

the guidelines is mandatory. Again, I have considered the guidelines. . . . . Again, those purposes and principles include the imposition of a sentence justly deserved in relation to the seriousness of the offenses. Again, you have very serious offenses, should be a punishment sufficient to prevent crime and promote respect for the law and the Court should also consider the [D]efendant's potential or lack of potential for rehabilitation. Accordingly, the [D]efendant is not entitled to the minimum sentence even when there are no applicable enhance[ment] factors. Again, I indicated which enhance[ment] factor I thought was there and I have considered all of those and considered the law in imposing the sentence.

Therefore, the sentence is as follows. With regard to the rape of a child, the [D]efendant is sentenced to 32 years. That is at 100 percent. With regard to the aggravated sexual battery in Count Two, the sentence is 10 years. With regard to Count Three, the sentence is 12 years. Those are all at 100 percent. With regard to whether it should be a concurrent or a consecutive sentence, again the Court has considered the law in determining the sentence. The rape of a child will run consecutively to the two aggravated sexual batteries. The two aggravated sexual batteries will run concurrent with each other. So as I understand, Count One is consecutive to Counts Two and Three. Counts Two and Three are concurrent.

Based on these findings, the trial court imposed an effective sentence of forty-four years of incarceration. It is from these judgments that the Defendant now appeals.

## II. Analysis
### A. Forensic Interview

On appeal, the Defendant asserts that K.D.'s forensic interview with Ms. Turner at the Rape Crisis Center was improperly admitted into evidence by the trial court. He contends that the interview "insufficiently demonstrated [K.D.'s] mental age" and that Ms. Turner took no steps to verify her mental abilities. He further argues that the timing of K.D.'s statement was too remote and that Ms. Turner asked leading questions. He finally contends that K.D.'s interview was tainted by questions she was asked by Elizabeth McDonald and Ms. Veen prior to the interview. The State responds that the trial court did not abuse its discretion when it admitted the recording because it made the required findings that the recording had the indicia of trustworthiness. The State contends that the Defendant's claims to the contrary are not supported by the evidence. We agree with the State.

Generally, "[a]dmission of evidence is entrusted to the sound discretion of the trial court, and a trial court's ruling on evidence will be disturbed only upon a clear showing of abuse of discretion." *State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004). The Tennessee

9

Rules of Evidence provide that all "relevant evidence is admissible," unless excluded by other evidentiary rules or applicable authority. Tenn. R. Evid. 402. Of course, "[e]vidence which is not relevant is not admissible." *Id.* Relevant evidence is defined as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Even relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

Tennessee Code Annotated section 24-7-123(a) states that

a video recording of a child by a forensic interviewer containing a statement made by the child under thirteen years of age describing any act of sexual contact performed with or on the child by another is admissible and may be considered for its bearing on any matter to which it is relevant in evidence at trial of the person for any offense arising from the sexual contact if the requirements of this section are met.

Tennessee Code Annotated section 24-7-123(b) provides that a video recording of a forensic interview may be admitted if:

(1) This child testifies, under oath, that the offered video recording is a true and correct recording of the events contained in the video recording and the child is available for cross[-]examination;

(2) The video recording is shown to the reasonable satisfaction of the court, in a hearing conducted pre-trial, to possess particularized guarantees of trustworthiness. In determining whether a statement possesses particularized guarantees of trustworthiness, the court shall consider the following factors:

(A) The mental and physical age and maturity of the child;
(B) Any apparent motive the child may have to falsify or distort the event, including, but not limited to, bias or coercion;
(C) The timing of the child's statement;
(D) The nature and duration of the alleged abuse;
(E) Whether the child's young age makes it unlikely that the child fabricated a statement that represents a graphic, detailed account beyond the child's knowledge and experience;
(F) Whether the statement is spontaneous or directly responsive to questions;
(G) Whether the manner in which the interview was conducted was reliable, including, but not limited to, the absence of any

10

leading questions;
(H) Whether extrinsic evidence exists to show the defendant's opportunity to commit the act complained of in the child's statement;
(I) The relationship of the child to the offender;
(J) Whether the equipment that was used to make the video recording was capable of making an accurate recording; and
(K) Any other factor deemed appropriate by the court[.]

*Id.* § 24-7-123(b). If the court determines that the video recording is not trustworthy, the inquiry ends, and the evidence will not be admitted. *See id.* § -123(b)(2). Ultimately, discretion regarding the admissibility of the evidence remains with the trial court. *See id.* § -123(a).

The Defendant claims that several of the "trustworthiness" factors were not met, specifically: (1) that the interview insufficiently demonstrated K.D.'s mental age (Factor A); (2) that the timing of the statement was too remote from the incident (Factor C); (3) that leading questions were used (Factor G); (4) that Elizabeth McDonald and Jammie Veen asked K.D. questions about the sexual contact, thereby tainting the interview (Factor B). The trial court made extensive findings regarding the trustworthiness factors and the admissibility of the interview recording, and we reiterate that, in the absence of a showing by the Defendant that the trial court abused its broad discretion, we will not reverse the trial court's decision to admit the recording. Specifically, regarding the Defendant's claims, the trial court found:

> [K.D.] appeared to be mature for her age as far as answering questions and stating what she believed had happened. [Factor A] There was no motive for [K.D.] to testify falsely or distort the events from what I could ascertain. [Factor B] The timing of [K.D.'s] statement was within a few weeks of this alleged event. [Factor C] . . . . The Court finds the interview was reliable and that there was the absence of any leading questions. [Factor G]

The evidence presented at the motion in *limine* supports the trial court's findings. Ms. Turner testified that she was trained to interview children in situations of sexual assault allegations and did not ask leading questions, rather open-ended ones to elicit a narrative response from [K.D.] K.D. testified that everything she had reported in the interview was true and the trial court questioned her about whether she understood what it meant to tell the truth on the stand and whether she would be able to do so. The trial court, based on her testimony, stated in open court that it believed that K.D. understood the difference between the truth and a lie and would testify truthfully. As to the timing of K.D.'s statement, there was no evidence presented that the approximately three-week time period between the events and the interview made it unreliable. No evidence was presented that any remoteness of the disclosure or the interview had any bearing on the veracity of K.D.'s

11

statements, nor was any evidence presented that K.D. was influenced by the adults around her. Accordingly, we conclude that the trial court did not abuse its discretion when it determined that the recording was admissible. The Defendant is not entitled to relief on this issue.

## B. Sufficiency of the Evidence

The Defendant next contends that the evidence is insufficient to support his convictions for rape of a child and aggravated sexual battery. He contends that there was insufficient proof of penetration for the rape of a child conviction and very limited proof, based only on K.D.'s accounts, of the aggravated sexual battery of J.M. and K.M. The State responds that the evidence was sufficient to prove that the Defendant's hand was on K.D.'s vagina and that penetration was proven by the presence of male DNA in K.D.'s vaginal swab. As to the aggravated sexual battery convictions, the State responds that K.D.'s testimony, corroborated by the testimony of Mr. Currie, was sufficient from which a jury could reasonably conclude that the Defendant had touched J.M. and K.M.'s intimate parts. We agree with the State.

When an accused challenges the sufficiency of the evidence, this court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the

weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). "'A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State.'" *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This court must afford the State the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

As charged here, rape of a child is the "unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." T.C.A. § 39-13-522 (2019). "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital . . . openings of the victim's . . . body [.]" *Id.* § 39-13-501(7). In order to find a defendant guilty of rape of a child, the State must prove beyond a reasonable doubt: (1) that the defendant had unlawful sexual penetration of the alleged victim or the alleged victim had unlawful sexual penetration of the defendant; (2) that the alleged victim was more than three (3) years of age but less than thirteen (13) years of age; and (3) that the defendant acted either intentionally, knowingly or recklessly. *See* 7 Tenn. Prac. Pattern Jury Instr. T.P.I.-Crim. 10.12. "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body . . . ." T.C.A. § 39-13-501(7).

The evidence viewed in the light most favorable to the State was that K.D. was on the sofa with the Defendant under a sheet and that he put his hand inside her underwear on her bare vagina. Elizabeth McDonald testified that the Defendant's hand was clearly on K.D.'s vagina while K.D.'s pants were down. K.D. indicated in her forensic interview that

the Defendant put his hand inside her underwear, on her vagina, and rubbed it in a circular motion. The presence of male DNA was identified in a DNA swab from K.D.'s vagina. This is sufficient evidence from which a jury could conclude that penetration, "however slight," occurred. K.D. was six years old at the time. In his recounting of what he had been told by the Defendant, Mr. Currie corroborated the evidence with consistent details of what occurred as well as K.D.'s name. This is sufficient evidence from which a jury could conclude beyond a reasonable doubt that the Defendant was guilty of rape of a child.

Aggravated sexual battery, as charged here, is the "unlawful sexual contact" by a defendant with a victim less than thirteen years of age. *See* T.C.A. § 39-13-504(a). Sexual contact is defined as "the intentional touching of the victim's intimate parts, or . . . of the clothing covering the immediate area of the victim's . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification. T.C.A. § 39-13-501(2). The evidence presented was that K.D. witnessed the Defendant putting his hand inside J.M.'s diaper and rub his bottom and putting his hand on K.M.'s vagina. Mr. Currie corroborated this evidence with a consistent account of what the Defendant told him. This is sufficient evidence from which a jury could conclude that the Defendant was guilty of aggravated sexual battery of J.M. and K.M. The Defendant is not entitled to relief.

## C. Sentencing

Lastly, the Defendant contends that the trial court erred when it sentenced him above the minimum range and when it imposed consecutive sentences. He contends that in light of the fact that he had no criminal record, the enhancement of his sentence for rape of a child, seven years above the minimum sentence, was excessive. He also contends that his sentences for the aggravated sexual battery convictions were excessive. As to consecutive sentencing, he contends that there was insufficient proof of psychological damage to the victim and that the sexual behavior occurred on one date, both factors weighing against consecutive sentencing.

The State responds that the trial court properly imposed a within-range sentence. The State points out that the trial court "accepted" the factors presented in favor of mitigation and also rejected some of the State's enhancement factors. The State argues that the trial court properly applied several enhancement factors to justify a sentence greater than the minimum. As to the imposition of partial consecutive sentences, the State contends that the trial court properly considered the applicable factors, namely that the Defendant had been convicted of multiple sexual offenses against minors, and reasonably determined that consecutive sentences were justified. We agree with the State.

### 1. Enhancement of the Sentence

"Sentences imposed by the trial court within the appropriate statutory range are to

14

be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id.* at 554-55; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). The reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. So long as the trial court sentences within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. *Id.* at 707.

The misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from a trial court's sentencing decision. *Id.* A reviewing court should not invalidate a sentence on this basis unless the trial court wholly departed from the principles of the Sentencing Act. *Id.* So long as there are other reasons consistent with the purpose and principles of sentencing, a sentence within the appropriate range should be upheld. *Id.*

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* T.C.A. § 40-35-210 (2019); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. T.C.A. § 40-35-103 (2019).

We conclude that the trial court properly sentenced the Defendant. The trial court considered the relevant principles and sentenced the Defendant to a within range sentence. We note that the trial court declined to apply several enhancement factors sought by the State. Relevant to enhancement factor (4), that a victim of the offense was particularly vulnerable because of age or physical or mental disability; the trial court applied the factor to the aggravated sexual battery conviction regarding J.M. based on the evidence that J.M. had autism. T.C.A. § 40-35-114(4) (2019). The trial court applied enhancement factor (14), that the Defendant abused a position of public or private trust, based on the evidence

15

that the Defendant had been entrusted with the victims' care on account of his close relationship with the family. T.C.A. § 40-35-114(14). As such, the appropriate application of enhancement factors (4) and (14) supports the trial court's sentencing decision. The Defendant is not entitled to relief on this issue.

## 2. Consecutive Sentencing

Where a defendant is convicted of one or more offenses, the trial court has discretion in determining whether the sentences shall be served concurrently or consecutively. T.C.A. § 40-35-115(a). "[T]he abuse of discretion standard, accompanied by a presumption of reasonableness, applies to consecutive sentencing determinations." *State v. Pollard*, 432 S.W.3d 851, 860 (Tenn. 2013). A trial court may order multiple offenses to be served consecutively if it finds by a preponderance of the evidence that a defendant fits into at least one of the seven categories in Code section 40-35-115(b). This court must give "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)[.]" *Pollard*, 432 S.W.3d at 861. When imposing consecutive sentences, the court must still consider the general sentencing principles that each sentence imposed shall be "justly deserved in relation to the seriousness of the offense," "no greater than that deserved for the offense committed," and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. §§ 40-35-102(1), -103(2), -103(4); *State v. Imfield*, 70 S.W.3d 698, 708 (Tenn. 2002). "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." *Pollard*, 432 S.W.3d at 862 (citing Tenn. R. Crim. P. 32(c)(1); *Bise*, 380 S.W.3d at 705).

Here, the trial court found that consecutive sentencing was proper, pursuant to section 40-35-115(b)(5), because the Defendant was "convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims[.]" The trial court determined that this factor was supported by the evidence and the witnesses' testimony at the sentencing hearing, including the victim impact statement. Based on the Defendant's multiple convictions for offenses involving the sexual abuse of a minor, as well as the evidence of the extensive impact on the victims' mental health and their behavior, we conclude that record fully supports the trial court's application of section 40-35-115 (b)(5). The Defendant is not entitled to relief.

## III. Conclusion

After a thorough review of the record and relevant authorities, we affirm the trial

court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE